#26073-a-JKK

**2012 S.D. 51**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                Plaintiff and Appellee,

    v.

LEONARD ALAN TOOHEY,             Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
BUTTE COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE JOHN W. BASTIAN
Judge

* * * *

MARTY J. JACKLEY
Attorney General

JOHN M. STROHMAN
Assistant Attorney General
Pierre, South Dakota             Attorneys for plaintiff
                                   and appellee.

STACI L. REINDL
Spearfish, South Dakota          Attorney for defendant
                                   and appellant.

* * * *

CONSIDERED ON BRIEFS
ON JANUARY 9, 2012

OPINION FILED **06/20/12**

#26073

KONENKAMP, Justice

[¶1.]     A jury found Leonard Alan Toohey guilty of first degree rape of a child. On appeal, he asserts that the child victim was not available for cross-examination as required under the Confrontation Clause, that the circuit court abused its discretion when it admitted evidence of other acts, and that there was insufficient evidence to support proof of penetration.

**Background**

[¶2.]     On June 9, 2010, C.M. and her daughter, K.M. (age ten), went to the post office. K.M. decided to wait in the car while her mother went inside. In the post office, C.M. ran into Toohey. He and his wife had been friends of C.M.'s family for years, but had not been spending as much time together recently. C.M. and Toohey exchanged small talk. Upon returning to her car, K.M. asked her mom why she did not like Toohey anymore. C.M. explained that she did not like some of the things Toohey, a military veteran, said in front of the children about the war. K.M. said, "Mom, I hate him." C.M. was shocked by her daughter's statement and questioned her. K.M. began crying. She asked her mother, "Do you remember when we went fishing?" C.M. responded, "Yeah." K.M. said, "Remember when me and [Toohey] went to look for something for the fish?" C.M. remembered that Toohey and K.M. had gone to an abandoned farmhouse to look for some rope to string fish. K.M. said, "He kissed me and called me his secret girlfriend." C.M. said, "Is that it?" K.M. said, "No." C.M. asked, "Well, what else happened?" K.M. replied, "He had me pull down my shorts and my panties and he touched me down there."

[¶3.]     C.M. called the sheriff's office, and within a few days, K.M. was taken to the Child Advocacy Center in Rapid City. There, Hollie Strand, a forensic interviewer, conducted a videotaped interview of K.M. K.M. described Toohey's actions during the fishing trip much the same as she did to her mother. She would not or could not give a name to her pudendum, but she agreed with Strand that it could be called her "private." On a diagram of a child, she pointed at the pudendum and said that Toohey touched her there with his "finger." When asked what it felt like when Toohey touched her there, K.M. said "it hurt." Strand asked, "do you know how on our privates on us girls we have that line right there [pointing to the pudendal area on the diagram], did [Toohey's] hand do something with that line?" When the child did not respond, Strand asked again, "[D]id [Toohey's] hand do something with that line?" K.M. then said, "[H]e put his finger there." Strand asked, "After [Toohey] bothered your private, did you notice anything when you went potty?" K.M. replied, "It kind of hurt."

[¶4.]     K.M. also described a later incident to Strand that happened when Toohey came to her family's home to help fix a car. K.M. asked Toohey to come into a room to see her cat. In the room, Toohey kissed her on her mouth and told her "not to tell anybody," saying she was his "secret girlfriend."

[¶5.]     Butte County Sherriff Fred Lamphere interviewed Toohey. The audio of the interview was recorded and played for the jury. Toohey admitted to fishing with K.M.'s family and to being alone with K.M. in a house together. He also admitted to being at K.M.'s residence to help work on a car. But he denied that he

touched K.M., kissed her, or called her his secret girlfriend during either time he was with her.

[¶6.] Toohey was indicted on one count of first degree rape in violation of SDCL 22-22-1(1). The date of the offense was alleged to be "the spring or summer of 2007," three years before K.M. first reported the incident to her mother. The State asked the court to allow admission of Toohey's act of kissing K.M. at K.M.'s house on the grounds that the kiss was relevant to prove motive, intent, opportunity, and lack of mistake or accident. *See* SDCL 19-12-5 (Rule 404(b)). Toohey responded that this subsequent act was insufficiently connected to the rape charge and was not relevant to any material fact at issue. He further asserted that any probative value of this evidence was substantially outweighed by the danger of unfair prejudice. *See* SDCL 19-12-3 (Rule 403). The court found the subsequent act admissible to prove intent, opportunity, and absence of mistake or accident, and not unfairly prejudicial.

[¶7.] K.M. testified at trial. When the State asked her specifically what Toohey did to her, she often failed to respond, as can be seen in the following excerpts from her direct examination:

> **State:** Can you kind of begin from where you start to feel uncomfortable? Or why you felt uncomfortable?
> **K.M.:** Because he had me pull down my shorts and everything.
> . . .
> **State:** Okay. Where were you at when that happened?
> **K.M.:** By the table.
> **State:** By the table. Okay. You said he had - - Did he tell you to do that?
> **K.M.:** Yes.
> **State:** Okay. And after he told you to pull down your shorts, what happened?
> **K.M.:** He, um, --

-3-

&#42; &#42; &#42;

**State:** Okay.  So you're standing by the table and he tells you to pull your shorts down, and then what happened?
**K.M.:** I did.
**State:** You did?
**K.M.:** Uh-huh.
**State:** Okay.  And then what happened?
**K.M.:** He had me pull down my underwear.
**State:** Okay.  And then did you do that, too?
**K.M.:** (Nodding head.)
**State:** Okay.  And after he did that, what did you do?
**K.M.:** He put me on the table.
**State:** Okay.  Were you sitting up or laying down?
**K.M.:** At first I was sitting up.
**State:** Okay.  Then what happened?
**K.M.:** He had me lay down.  . . .
**State:** When you were laying down, were your shorts up or down?
**K.M.:** Down.
**State:** And your underwear?
**K.M.:** (Nodding head.)
**State:** Down?
**K.M.:** (Nodding head.)  Yes.
**State:** And where was [Toohey] when you were laying down?
**K.M.:** In front of me.
**State:** By the table?
**K.M.:** Uh-huh.
**State:** Okay.  Do you remember if he said anything to you?
**K.M.:** No.
**State:** He didn't say anything?
**K.M.:** (Shaking head.)  I don't know.  I don't believe so.
**State:** Did he do anything while you were laying down?
**K.M.:** Yes.
**State:** What did he do?
**K.M.:** (No response.)

&#42; &#42; &#42;

**State:** Okay.  On your way back fishing, did [Toohey] say anything to you?
**K.M.:** Yes.
**State:** What did he say?
**K.M.:** He told me not to tell anybody.
**State:** What else?
**K.M.:** He said I was his secret girlfriend.

&#42; &#42; &#42;

**State:** Can you kind of tell us where on your body?  Did something happen to your body that you didn't like?
**K.M.:** (Witness crying, brief pause.)

    **\* \* \***

**State:** Okay.  Do you remember what you told Hollie [Strand] happened at the house?
**K.M.:** The same thing I told my mom.
**State:** Same thing you told your mom?
**K.M.:** (Nodding head.)
**State:** What was that?
**K.M.:** (Brief pause, witness crying.)
**State:** What was that, [K.M.]?
**K.M.:** (Witness crying.  No response.)
**State:** What did [Toohey] do?
**K.M.:** (No response.)
**State:** Do you think you're going to be able to tell the jury what happened?
**K.M.:** (No response.)

    **\* \* \***

**State:** Did [Toohey] do something - - What did [Toohey] do something with?
**K.M.:** His hand.
**State:** His hand?
**K.M.:** (Nodding head.)
**State:** What did he do with his hand?
**K.M.:** (No response.)

    **\* \* \***

**State:** Okay.  Can you tell us what [Toohey] did with his hand?
**K.M.:** (No response.)  . . .
**State:** Can you tell us what [Toohey] did with his hand?
**K.M.:** (No response.)
**State:** Do you know what body part it was?
**K.M.:** (Nodding head.)
**State:** You do?  . . .
**State:** All right.  Do you know what the body part, what it is, where it is?
**K.M.:** Where it is.
**State:** Huh?
**K.M.:** I know where it is.
**State:** You know where it is?
**K.M.:** (Nodding head.)
**State:** Do you have a name for it or have you ever heard it called anything before?  Where is it?  You said you know where it is.  Where is it at?

**K.M.:** (No response.) . . .

   * * *

**State:** Do you remember how that made you feel?
**K.M.:** Uncomfortable.
**State:** Uncomfortable?  Can you tell us what body part it was?  Have you ever heard it called something before?
**K.M.:** (Shaking head.)
**State:** That you can - - It's okay.  In here you can say whatever word you want.
**K.M.:** (Shrugging shoulders.)
**State:** Okay? It's okay.
**K.M.:** (No response.)

   * * *

**State:** Okay.  Have you ever heard a name for what body part it was?  Have you ever heard a name for it?
**K.M.:** (No response.)  (Shaking head.)
**State:** You can - - You can answer out loud.  It's kind of yes or no.  Did you – Have you ever heard it called anything before?
**K.M.:** No.
**State:** No?  When you told your mom, what did - - did you call it anything when you told your mom?
**K.M.:** (Shaking head.)
**State:** No?  Do you remember what you said to her?
**K.M.:** (Nodding head.)
**State:** What did you say to her?  . . .  It's okay.  Same thing you told Hollie; right?
**K.M.:** (Nodding head.)
**State:** Okay.  What did you say?
**K.M.:** He touched me.
**State:** He touched you?
**K.M.:** (Nodding head.)
**State:** Did you say where?
**K.M.:** (Shaking head.)
**State:** Do you remember - - Do you remember if that's all you said?  He touched you?
**K.M.:** (Nodding head.)
**State:** With his hand?
**K.M.:** (Nodding head.)
**State:** And earlier we said it wasn't by your shirt.
**K.M.:** (Shaking head.)
**State:** Was it on your back side or your front side?  . . .  What side?
**K.M.:** Front.

[¶8.]      C.M. and Strand also testified.  They repeated what K.M. had told them.  C.M. said that K.M. told her Toohey kissed her, called her his secret girlfriend, and that he touched her "down there."  Strand testified about her interview of K.M., and the video of the interview was played for the jury.

[¶9.]      At the close of the State's case, Toohey moved for a judgment of acquittal.  He asserted that the State failed to present evidence of penetration sufficient to sustain the rape charge.  In response, the State contended that because K.M. testified that Toohey touched her and "it hurt," the jury could infer that Toohey raped K.M.  The court denied the motion, and the jury found Toohey guilty of first degree rape.  He was sentenced to twenty years in the penitentiary.

[¶10.]      Toohey appeals on grounds that (1) K.M. was unavailable for cross-examination, and therefore, her hearsay statements were erroneously admitted; (2) the court abused its discretion in admitting other act evidence; and (3) there was insufficient evidence of penetration to sustain the first degree rape verdict.

[¶11.]      A circuit court's evidentiary rulings are reviewed for an abuse of discretion, including its decision to allow a witness to testify about certain hearsay statements.  *State v. Carothers* (*Carothers II*), 2006 S.D. 100, ¶¶ 11, 14, 724 N.W.2d 610, 616-17 (citation omitted).  A court's decision to admit other act evidence is similarly reviewed for an abuse of discretion.  *State v. Wright,* 1999 S.D. 50, ¶ 12, 593 N.W.2d 792, 797 (citation omitted).  However, a claim of insufficient evidence to sustain a guilty verdict is reviewed de novo.  *State v. Morse*, 2008 S.D. 66, ¶ 10, 753 N.W.2d 915, 918 (citation omitted).

### 1. Confrontation and Witness Unavailability

[¶12.] Toohey argues that although K.M. was physically present in court, she was effectively unavailable as a witness; therefore, he was denied his right to conduct a full and effective cross-examination. If K.M. was unavailable to testify, her prior statements to her mother and Strand may have been inadmissible. Admission of "testimonial" hearsay statements against a criminal defendant violates the Confrontation Clause of the Sixth Amendment if the declarant is unavailable to testify at trial and the defendant had no previous opportunity to cross-examine. *Crawford v. Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 1374, 158 L. Ed. 2d 177 (2004). "*Crawford* fundamentally changed Confrontation Clause jurisprudence concerning hearsay." *State v. Carothers (Carothers I)*, 2005 S.D. 16, ¶ 6, 692 N.W.2d 544, 546.

[¶13.] Toohey is constitutionally guaranteed the right to confront the witnesses against him.[1] *See* U.S. Const. amend. VI; *Carothers I*, 2005 S.D. 16, ¶ 8, 692 N.W.2d at 545. "[A] child victim's statements during a forensic interview . . . may be 'testimonial' under *Crawford*." *United States v. Charboneau*, 613 F.3d 860, 861 (8th Cir. 2010) (citing *Bobadilla v. Carlson,* 575 F.3d 785, 791-93 (8th Cir. 2009)). But the United State Supreme Court's holding in *Crawford* did not alter the

---

1. Under certain conditions, a South Dakota statute allows admission of a child's out-of-court statements "describing any act of sexual contact or rape." SDCL 19-16-38. However, out-of-court "testimonial" statements are not admissible merely because they meet the requirements of this statute. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. *See also Crawford*, 541 U.S. at 42, 124 S. Ct. at 1359.

principle that the Confrontation Clause "is satisfied when the hearsay declarant[], here the alleged child victim[], actually appear[s] in court and testif[ies] in person." *Id.* (citation omitted).

[¶14.]     A "troublesome issue" arises when a child witness is available to testify but is too young to be subjected to cross-examination as contemplated in the constitution. *United States v. Nick*, 604 F.2d 1199, 1202 (9th Cir. 1979). "[A]dmission of a [witness's] prior statements requires a 'full and effective cross-examination.'" *Carothers II*, 2006 S.D. 100, ¶ 16, 724 N.W.2d at 617 (quoting *State v. McKinney*, 2005 S.D. 73, ¶ 21, 699 N.W.2d 471, 479 (quoting *California v. Green*, 399 U.S. 149, 159, 90 S. Ct. 1930, 1935, 26 L. Ed. 2d 489, 497 (1970))). Although this right is generally satisfied when a defendant "is given a full and fair opportunity to probe and expose [a witness's] infirmities through cross-examination," *Delaware v. Fensterer*, 474 U.S. 15, 22, 106 S. Ct. 292, 295, 88 L. Ed. 2d 15 (1985), when a witness is young there can be additional confrontational concerns if the child is "too young and too frightened to be subjected to a thorough direct or cross-examination." *State v. McCafferty*, 356 N.W.2d 159, 163 (S.D. 1984) (quoting *United States v. Iron Shell*, 633 F.2d 77, 87 (8th Cir. 1980)). South Dakota law defines unavailability as including a declarant who is "unable to be present or testify" at the trial because of a "then-existing physical or mental illness or infirmity." SDCL 19-16-29(4). Thus, a witness's unavailability can be premised on mental limitations, as well as physical absence.

[¶15.]     While K.M. answered questions on all the surrounding particulars, she did not answer many of the prosecutor's questions on the details of the rape —

especially on the essential element of penetration. This does not necessarily mean, however, that she was unavailable for confrontation purposes. The "fact that a witness's testimony is unsatisfactory does not render the witness unavailable." *State v. Biggs*, 333 S.W.3d 472, 477 (Mo. 2011). The Confrontation Clause only guarantees "an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *United States v. Owens*, 484 U.S. 554, 559, 108 S. Ct. 838, 842, 98 L. Ed. 2d 951 (1988) (quoting *Kentucky v. Stincer*, 482 U.S. 730, 739, 107 S. Ct. 2658, 2664, 96 L. Ed. 2d 631 (1987)) (additional citations omitted). Indeed, confrontation "includes no guarantee that every witness called by the prosecution will refrain from giving testimony that is marred by forgetfulness, confusion, or evasion." *Fensterer*, 474 U.S. at 21-22, 106 S. Ct. at 295. A child's inability to answer questions about penetration, by itself, does not render her unavailable for confrontation purposes. *State v. Bishop*, 816 P.2d 738, 743 (Wash. 1991).

[¶16.] The *Crawford* decision spoke in almost categorical terms: "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." 541 U.S. at 59 n.9, 124 S. Ct. at 1369 n.9. Several courts have taken this to mean that even a witness with no memory of the events in question is nevertheless present and available for cross-examination under *Crawford*. *State v. Pierre*, 890 A.2d 474, 499-500 (Conn. 2006); *State v. Gorman*, 854 A.2d 1164, 1177 (Me. 2004); *State v. Holliday*, 745

N.W.2d 556, 567-68 (Minn. 2008); *Biggs*, 333 S.W.3d at 477-78; *State v. Legere*, 958 A.2d 969, 977-78 (N.H. 2008).[2]

[¶17.]    Here, K.M. did more than simply appear in court.  She was able to testify about when and where the incidents with Toohey took place, the details leading up to the rape, and what was said.  On cross-examination, defense counsel asked K.M. about her family circumstances, her age, her school activities, her knowledge of the various people involved, her acquaintance with Toohey and his wife, the abandoned farmhouse where the rape occurred, the clothing she wore, and the others she spoke with about the rape.  K.M. responded to every question. Toohey's counsel chose not to ask questions about penetration.

[¶18.]    Toohey does not challenge the circuit court's finding of K.M.'s competency.  Competency signifies more than simply appearing in court.  It means the witness (1) can distinguish truth from falsehood; (2) has the capacity to observe, recollect, and communicate information; and (3) is willing to swear an oath or make some other affirmative assurance that he or she will tell the truth.  SDCL 19-14-3 (Rule 603); *Carothers II*, 2006 S.D. 100, ¶ 12, 724 N.W.2d at 616; *State v. Guthmiller*, 2003 S.D. 83, ¶ 12, 667 N.W.2d 295, 301.  We conclude that K.M. was available for cross-examination, and thus Toohey was not denied cross-examination

---

2.    *But see* SDCL 19-16-29(3) (Rule 804(a)) ("lack of memory of the subject matter of his statement" renders witness unavailable).  Yet memory loss may not render a witness "unavailable" in the constitutional sense. *Owens,* 484 U.S. at 557-60, 108 S. Ct. at 841-42.

under the Confrontation Clause. Therefore, the trial court did not err in admitting the child's prior hearsay statements.[3]

### 2. Other Act Evidence

[¶19.] Toohey next argues that the circuit court erred when it admitted evidence that he kissed K.M. at K.M.'s house months after the rape. He maintains that the other act evidence does not in any way make the existence of an admissible fact, i.e., the rape, more or less probable. The State, on the other hand, contends that the evidence was relevant to prove intent and lack of mistake or accident because Toohey, as the circuit court found, said during his law enforcement interview that if any touching happened it was accidental or unintentional.

[¶20.] SDCL 19-12-5 (Rule 404(b)) permits the admission of "[e]vidence of other crimes, wrongs, or acts" to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." The other act evidence must be relevant to a material issue in the case, and "the probative value of the evidence [must not be] substantially outweighed by its prejudicial effect." *Wright*, 1999 S.D. 50, ¶ 17, 593 N.W.2d at 800. Other act evidence does not have to be a prior act to be admissible under SDCL 19-12-5 (Rule 404(b)).

[¶21.] The evidence of Toohey kissing K.M. months after the rape was relevant to show his lascivious interest in her. And we cannot say the court abused its discretion in finding that the probative value of the evidence was not

---

3. Because of our ruling that K.M. was available for cross-examination in accord with the Confrontation Clause, we need not decide whether K.M.'s prior statements were "testimonial."

substantially outweighed by its prejudicial effect. Furthermore, the court gave a proper limiting instruction to the jury on how to consider this evidence. Thus we affirm admission of the testimony of Toohey's subsequent kiss and "secret girlfriend" remark to K.M.

### 3. Sufficiency of Proof of Penetration

[¶22.]     Toohey argues that there was insufficient evidence of penetration to sustain the rape verdict. Sexual penetration is defined as "any intrusion, however slight, of any part of the body or of any object into the genital or anal openings of another person's body." SDCL 22-22-2. We have interpreted this definition to mean that evidence of vulvar or labial penetration, however slight, is sufficient to prove penetration of the female genital opening. *State v. Packed*, 2007 S.D. 75, ¶ 32, 736 N.W.2d 851, 861 (citations omitted). Penetration can be inferred from circumstantial evidence and need not be proved by medical evidence. *Spurlock v. State,* 675 N.E.2d 312, 315 (Ind. 1996); *see also State v. Floody*, 481 N.W.2d 242, 259 (S.D. 1992) (Henderson, J., concurring). Indeed, there is no requirement of having direct physical evidence to support each element of an offense: elements may be inferred from other evidence indirectly proving the element at issue. *Coleman v. Johnson*, ___ U.S. ___, ___, 132 S. Ct. 2060, 2064, ___ L. Ed. 2d ___ (2012) (per curiam). In cases involving child victims, a child's limited understanding of her exact anatomical features does not negate the child's ability to provide circumstantial evidence that penetration occurred. *United States v. St. John*, 851 F.2d 1096, 1099 (8th Cir. 1988). Yet a conviction cannot be sustained on mere

-13-

suspicion or possibility of guilt. *United States v. Plenty Arrows*, 946 F.2d 62, 65 (8th Cir. 1991).

[¶23.] When K.M. testified, she was ten years old. Children of that age often lack the vocabulary to specifically describe an act of sexual penetration, but "the victim need not go into sordid detail to effectively establish that penetration occurred during the course of a sexual assault." *See Wilson v. State*, 752 A.2d 1250, 1256 (Md. Ct. App. 2000) (citation omitted). Through her trial testimony and her statements to her mother and Strand, K.M. was able to give many details surrounding the rape. She and Toohey were alone in a farmhouse. She was standing by a table. Toohey had her pull her shorts and underwear down. He then placed her on a table and told her to lie down. While she was lying on the table, undressed from the waist down, Toohey "touched" her "front" (pudendal area) and "it hurt." Other courts have examined similar facts.

[¶24.] Those courts finding insufficient proof of penetration in these circumstances emphasize the absence of any evidence other than touching, with no experience of pain. For example, in *State v. Hicks*, 352 S.E.2d 424, 427-28 (N.C. 1987), the victim only said that the defendant put his penis in the back of her. In *Plenty Arrows*, 946 F.2d at 65, the court held insufficient the victim's testimony that the defendant touched her "from my back of my behind." In *State v. Johnson*, 512 S.E.2d 795, 799 (S.C. 1999), the victim said the defendant "touched me" and "[i]t made me feel bad." In *Moore v. Commonwealth*, 491 S.E.2d 739, 742 (Va. 1997), the victim's testimony was that the defendant rubbed his penis "on" her vagina, but the prosecutor elicited no further details. And in one case, the expressed lack of pain

from the touching was deemed significant. In *State v. Torres*, 464 P.2d 953, 955 (Ariz. 1970), the court held "[t]here was no proof of even the slightest penetration," when the victim specifically testified on cross-examination that what was done to her did not hurt.

[¶25.] In contrast, where the victim experienced some pain from the genital touching, several courts have concluded that sufficient evidence of penetration was shown.[4] In *State v. Mathis*, 340 S.E.2d 538, 540-41 (S.C. 1986), a six year old testified that the defendant touched her with his penis, but could not remember whether he had put it inside her body. Yet she said it hurt. The court found this sufficient evidence of some "intrusion, however slight." *Id.* at 541. Likewise, in *Swain v. State*, 629 So. 2d 699, 701 (Ala. 1993), the court ruled that "the victim's testimony that Swain had 'stuck' his penis between her legs and that it hurt [was]

---

4. The dissent cites *Atteberry v. State*, 991 N.E.2d 601 (Ind. Ct. App. 2009) as factually similar. But this is unsupported for multiple reasons. First, in our case, the victim testified, while in *Atteberry*, the victim was deceased. Second, South Dakota defines sexual penetration as "any intrusion, however slight, of any part of the body or of any object into the genital or anal openings of another person's body." SDCL 22-22-2. Indiana's rape statute requires proof of penetration of the "female sex organ by the male sex organ." Ind. Code § 35-42-4-1(a). Third, in *Atteberry*, the defendant was convicted for rape of the female sex organ (vagina) solely on proof of trauma to the *anus* and evidence of semen in the victim's underwear. Both the facts and the law here are completely different.

The dissent also contends that *Goolsby v. State* presents similar facts and holds that evidence of penetration is insufficient on testimony of pain. 517 N.E.2d 54 (Ind. 1987). How *Goolsby* is factually similar is unclear. Once again, Indiana defines rape differently than South Dakota. *Goolsby* involved an unconscious adult victim, who had consensual intercourse within forty-eight hours before her attack, and who could not testify to the specifics of her attack. Rather, she said that she "may have been raped" because she felt tenderness in her vaginal area.

sufficient evidence from which the jury could have inferred that Swain had actually penetrated the victim's labia pudendum." In *State v. Kincaid*, 124 P. 684, 686 (Wash. 1912), the twelve-year-old victim testified: "The last time I think he did do something the last time, but I do not know. He hurt me a little, quite a little, the last time." The court concluded: "the repeated efforts of the defendant and the pain of the prosecuting witness, if the jury believed the testimony, were facts from which penetration to some extent would almost necessarily be inferred." *Id.*

[¶26.] While these cases are not controlling, they highlight the fact that on a claim of insufficiency of the evidence, we must view all the evidence in a light most favorable to the verdict and determine whether that verdict "was so insupportable as to fall below the threshold of bare rationality."[5] *Coleman*, ___ U.S. at ___, 132 S. Ct. at 2065; *Morse*, 2008 S.D. 66, ¶ 10, 753 N.W.2d at 918 (citation omitted). The essential elements of rape do not require direct evidence of penetration. Rather, a rape conviction is sustainable when there is circumstantial evidence of "any intrusion, however slight, of any part of the body or of any object into the genital or anal openings of another person's body." *See* SDCL 22-22-2. Here, the child victim indicated that Toohey's "touch" was in her pudendal area, and it caused her pain.

[¶27.] It is important to remember that our analysis does not require us to ask ourselves whether we "believe[] that the evidence at the trial established guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781,

---

5. This "deferential standard" does not permit appellate courts to perform a "fine-grained factual parsing" of the evidence to "unduly impinge[] on the jury's role as factfinder." *Coleman,* ___ U.S. at ___, 132 S. Ct. at 2064.

2789, 61 L. Ed. 2d 560 (1979) (citation omitted). It is the jury's responsibility, not ours, "to decide what conclusions should be drawn from evidence admitted at trial." *Coleman*, ___ U.S. at ___, 132 S. Ct. at 2062 (*quoting Cavazos* v. *Smith*, ___ U.S. ___, ___, 132 S. Ct. 2, 4, 181 L. Ed. 2d 381 (2011) (per curiam)). Our duty is to determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at ___, 132 S. Ct. at 2064 (citation omitted). From this evidence, we conclude that rational jurors could find proof of penetration beyond a reasonable doubt.

[¶28.] Affirmed.

[¶29.] GILBERTSON, Chief Justice, and ZINTER and WILBUR, Justices, concur.

[¶30.] SEVERSON, Justice, dissents.


SEVERSON, Justice (dissenting).

[¶31.] I respectfully dissent. "Our review of the sufficiency of the evidence is de novo." *State v. Plenty Horse*, 2007 S.D. 114, ¶ 5, 741 N.W.2d 763, 764 (quoting *State v. Tofani*, 2006 S.D. 63, ¶ 35, 719 N.W.2d 391, 400). When reviewing a claim of insufficiency of the evidence, the question is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People ex rel. W.T.M.,* 2010 S.D. 45, ¶ 15, 785 N.W. 264, 267 (quoting *In re J.H.*, 2008 S.D. 88, ¶ 13, 756 N.W.2d 549, 551-52). Sexual penetration is an essential element of the

crime of rape. SDCL 22-22-1. Sexual penetration is "any intrusion, however slight, of any part of the body or of any object into the genital or anal openings of another person's body." SDCL 22-22-2. As the majority notes, penetration can be inferred from circumstantial evidence. *Spurlock v. State,* 675 N.E.2d 312, 315 (Ind. 1996). However, this Court cannot uphold a conviction that is "based on a mere suspicion or possibility of guilt." *United States v. Plenty Arrows*, 946 F.2d 62, 65 (8th Cir. 1991) (quoting *United States v. Robinson,* 782 F.2d 128, 129 (8th Cir. 1986)).

[¶32.]     In this case, there is no direct evidence indicating that sexual penetration occurred. The majority opinion concludes that K.M.'s testimony Toohey touched her "front," and the evidence that K.M. told the forensic interviewer that the touch "hurt," is sufficient circumstantial evidence of penetration to permit the jury to find beyond a reasonable doubt that Toohey was guilty of rape. Majority Opinion ¶ 26. I disagree.

[¶33.]     The cases cited in the majority opinion are factually distinguishable from this case. *See* Majority Opinion ¶¶ 24-25. While the examination of those factually distinguishable cases may be helpful in our analysis, they are not controlling. Indeed, other courts presented with facts analogous to this case have held that the evidence of penetration was insufficient to support a conviction of rape. *See, e.g.*, *Atteberry v. State*, 911 N.E.2d 601, 611 (Ind. Ct. App. 2009) (overturning a conviction of rape because evidence of trauma to the victim's anus and the presence of semen stains in her underwear was insufficient evidence that the defendant penetrated the victim's sex organ with his penis, as required under the applicable Indiana statute); *Goolsby v. State*, 517 N.E.2d 54, 58 (Ind. 1987)

(holding that a victim's testimony that her vaginal area felt tender when she awoke after being knocked unconscious during an attack was insufficient evidence of penetration to support a conviction of rape). Ultimately, we must examine K.M.'s testimony at trial and her statements to the forensic interviewer to determine whether this evidence supports the jury's finding of guilt beyond a reasonable doubt. Even viewing this evidence in a light most favorable to the State, I believe it is subject to too much speculation and conjecture to support such a finding. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979) (noting that, when determining whether the evidence at trial was sufficient to support a criminal conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt").

[¶34.] The State elected to charge Toohey with rape in the first degree, rather than a crime that did not require proof of penetration. The State was thus required to present substantial evidence of sexual penetration to sustain a conviction. *Plenty Horse*, 2007 S.D. 114, ¶ 5, 741 N.W.2d at 765 (quoting *Tofani,* 2006 S.D. 63, ¶ 35, 719 N.W.2d at 400). While K.M.'s testimony that Toohey touched her "front" and "it hurt" would support a finding that Toohey made external contact with K.M.'s genitalia, the testimony is legally insufficient to support a conviction of rape in the first degree because it did not provide the jury with a reasonable basis to infer, beyond a reasonable doubt, that penetration occurred. Based on the evidence admitted at trial, the jury's finding that Toohey sexually penetrated K.M. could only be based on speculation. It could not logically be based on reasonable inferences

that would support a finding of guilt beyond a reasonable doubt. Accordingly, I would hold that as a matter of law the evidence was insufficient to support a conviction of rape in the first degree.